**B & B TRITECH, INC. f/k/a B & B Chemical Company, Inc., W.B. Brock and Isabel Brock, Petitioners**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 90–1558.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1992.

Decided March 6, 1992.

Rehearing En Banc Denied April 9, 1992.

Susan E. Trench, Miami, Fla., for petitioners.

John Copeland Nagle, Atty. U.S. Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen., and Raymond Ludwiszewski, Acting Gen. Counsel, Earl Salo, Asst. Gen. Counsel, and George Wyeth, Atty., U.S.E.P.A., Washington, D.C., were on the brief, for respondent. Eileen T. McDonough, Atty. U.S. Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Before MIKVA, Chief Judge, EDWARDS and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the court filed PER CURIAM.

PER CURIAM:

Petitioners argue that the Environmental Protection Agency (the "EPA" or "Agency") should not have listed the B & B Chemical Company site on the National Priorities List of hazardous waste releases.

We deny the petition, but urge the Agency to promptly consider delisting the site.

## I. Background

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") requires the President to prepare a "national contingency plan for the removal of ... hazardous substances," and therein to list "national priorities among the known releases or threatened releases throughout the United States." 42 U.S.C. § 9605(a) (1988). The EPA has been delegated responsibility for the National Priorities List ("NPL"), and periodically updates the list through informal rulemaking. The Hazard Ranking System ("HRS"), a mathematical model, is used to evaluate proposed NPL sites. Our prior decisions have fully described the NPL and the HRS. *See, e.g., Linemaster Switch Corp. v. EPA*, 938 F.2d 1299 (D.C.Cir.1991); *City of Stoughton v. EPA*, 858 F.2d 747 (D.C.Cir.1988); *Eagle–Picher Indus. v. EPA*, 822 F.2d 132 (D.C.Cir.1987) ("*Eagle–Picher III*"); *Eagle–Picher Indus. v. EPA*, 759 F.2d 922 (D.C.Cir.1985) ("*Eagle–Picher II*"); *Eagle–Picher Indus. v. EPA*, 759 F.2d 905 (D.C.Cir.1985) ("*Eagle–Picher I*").

Congress amended CERCLA in 1986. The Superfund Amendments and Reauthorization Act ("SARA") required a new HRS—one that would "assure, to the maximum extent feasible, that the ... relative degree of risk to human health and the environment posed by sites and facilities [is accurately assessed]." 42 U.S.C. § 9605(c)(1) (1988). SARA set a 1988 deadline, which the EPA missed: the new model did not become effective until March, 1991. *See* 55 Fed.Reg. 51,532 (1990) (promulgating new HRS); 40 C.F.R. pt. 300 app. A (1990) (original HRS). In *Linemaster Switch*, we held that the Agency could update the NPL with the original HRS, even though SARA's deadline had passed. *See* 938 F.2d at 1302–05.

The B & B Chemical Company ("B & B") is a family-owned firm with a manufacturing facility in Hialeah, Florida. On June 24, 1988, the EPA proposed adding the Hialeah facility to the NPL. *See* 53 Fed. Reg. 23,988 (1988). Groundwater sampling had revealed a plume of contamination underneath the site, in the shallow layer of the so-called Biscayne Aquifer. This plume apparently stemmed in part from "soakage pits" that B & B had once used for its waste water. The site received a proposed HRS score of 35.35 (the NPL threshold is 28.50), based solely on the risk that contamination would migrate through the ground water.

The Ground Water Migration Route score in the HRS[1] is composed of two different factors: "Waste Characteristics" and "Targets." The Targets factor measures the risk that contamination will spread to a substantial population, and has two components: "Distance to Nearest Well/Population Served" and "Ground Water Use." *See* 40 C.F.R. pt. 300 app. A § 3.5 (1990). The distance to nearest well "is measured from the hazardous substance ... to the nearest well that draws water from the aquifer of concern." *Id.* at 105. Population served "includes residents as well as others who would regularly use the water" from wells within three miles of the site, but those "who do not use water from the aquifer of concern are not to be counted." *Id.* at 107.[2] The HRS has formulas for quantifying and then combining these two components.

There are four public wellfields within three miles of the Hialeah site, and these connect to a regional distribution system serving some 750,000 people. However, the wellfields draw from deeper ground water, while the contamination underneath the site is largely confined to the shallow aquifer layer. Moreover, the regional water authority no longer uses the fields as a

---

1. Except where otherwise noted, references to the HRS denote the original version.

2. *See also* 47 Fed.Reg. 31,180, 31,191 (1982) (promulgating original HRS) ("The Agency ... has changed the [proposed] text under 'Population Served By Groundwater' ... to require more definitive evidence of ground water use. People within three miles who do not use water from the aquifer of concern are not to be counted.").

source of supply, and only pumps them for a short period each day, so as to keep the equipment operable. The EPA nonetheless counted the wellfields in B & B's Targets score: the B & B facility was scored as "serving" a population of 750,000, the "nearest well" was found to be within one mile of the site, and the Agency proposed a Distance to Nearest Well/Population Served score of 35 (out of 40).

B & B protested the proposed NPL listing, but the Agency refused to change its HRS score, and the Hialeah site was added to the NPL effective October 1, 1990, see 55 Fed.Reg. 35,502 (1990). The company and its owners now petition for review.

## II. ANALYSIS

■ Congress' goal in SARA was to assure that the HRS "accurately assesses relative risks to human health and the environment ... within the context of the purpose for the National Priorities List; i.e., identifying for the States and the public those facilities and sites which appear to warrant remedial actions." H.R. CONF.REP. No. 962, 99th Cong., 2d Sess. 199 (1986). The B & B site did not receive the benefit of SARA, but was scored under the original version of the HRS. This case shows why Congress required a new model.[3]

Petitioners rightly argue that the EPA's calculation of the Distance to Nearest Well/Population Served subfactor was highly formulaic.[4] The Agency made two crucial assumptions. First, the entire Biscayne Aquifer was treated as a single "aquifer of concern," and thus the shallow plume of contamination underneath the B & B site was presumed accessible to the nearby wellfields, despite the fact that these fields drew from the deep aquifer layer. The EPA's justification was that "traces" of contamination had been found in the deep layer, and that the boundary between the deep and shallow layers was sufficiently permeable for vertical migration. See Response to Comments at 4–48 to 4–50, reprinted in Petitioners' Appendix 236, 252–54. Second, the EPA found that 750,000 people were "using" the wellfields, despite the fact that the wellfields had been taken out of service and were only pumped intermittently to keep the equipment operable. The justification, here, was that a "limited amount of water from these wellfields enters the distribution system daily." Id. at 4–54, reprinted in Petitioners' Appendix 236, 258.

Despite our concern over the seemingly unfair effects of the overly formalistic approach followed by EPA in this case, we are constrained to deny the petition. Our case law endorses the "Hazard Ranking System's preference for using formulas," Eagle–Picher III, 822 F.2d at 146, and emphasizes that "the NPL is simply a rough list of priorities, assembled quickly and inexpensively," Eagle–Picher II, 759 F.2d at 932. Specifically, we have held that the EPA can treat two separate ground water routes as a single "aquifer of concern" if the two are connected. "[W]here a contaminated aquifer spreads water to an aquifer supplying a target population, contamination to the first is hazard to the second and the 'Agency reasonably treats them as a unit for purposes of the Hazard Ranking System.'" City of Stoughton, 858 F.2d at 752 (quoting Eagle–Picher III, 822 F.2d at 139) (brackets omitted). The presence of trace contaminants in the deep aquifer layer, together with the direct evidence of vertical permeability, was sufficient to demonstrate a connection between the two layers of the Biscayne Aquifer. See also Eagle–Picher III, 822 F.2d at 150 (upholding NPL listing despite fact that "water naturally cleanses itself of contaminants as it moves [from the site] through

---

3. Of course, we express no opinion here about the validity of the new HRS. The conference report stated that the HRS need not be "equivalent to detailed risk assessments," id. at 200, and we do not suggest otherwise.

4. This is the only serious challenge presented here. Petitioners argue that the EPA had no

evidence of "soakage pits," but the record clearly rebuts this contention. They also suggest that the shallow aquifer layer is discontinuous, but such discontinuity is irrelevant if the entire Biscayne Aquifer can be treated as a single "aquifer of concern." Petitioners do not contest the Ground Water Use score.

geological formations to the wells from which the water is drawn").

■ We also have specifically permitted Agency imprecision in calculating the target population. In *Eagle–Picher I,* a general challenge to the HRS, we held that the EPA could "estimat[e] the population within a certain radius of the release [instead of] utiliz[ing] actual population figures." 759 F.2d at 921. In *City of Stoughton,* we declared that the Agency need not divide the population into subgroups, even where subdivision would produce a more accurate score. *See* 858 F.2d at 754–55. Finally, in the recent *Linemaster Switch* case, we again allowed a challenged Targets score and emphasized that the EPA "properly ... included within its calculation all people who draw water from wells located within three miles of the hazardous substances." 938 F.2d at 1307. Given these precedents, we are constrained to find that the EPA could count the four wellfields proximate to B & B: a population of 750,000 did indeed "use" the water from these fields, if this word is formulaically interpreted to cover minimally-used wells.

However, the Agency's decision remains a troubling one. The record does not disclose whether the B & B site poses any real risk to the public, because the EPA did not address that question. We do not know whether dangerous quantities of contaminants flow from the site to the wellfields, or from the fields into the regional distribution system. Agency counsel conceded at oral argument that the site would not be dangerous, indeed would not be listed, if the wellfields were only pumped once a year: *that* would be equivalent to zero pumping. But the Agency has not yet examined whether minimal daily pumping creates a significantly higher risk than zero pumping, given the "trace" wastes that B & B has contributed to the deep aquifer layer.[5]

Despite the very real possibility that their facility does not endanger the population, petitioners must now bear the considerable costs that result from an NPL listing. Moreover, these costs might have been avoided if the Agency had more promptly complied with SARA. The ground water segment of the new HRS is quite sophisticated; *inter alia,* "[p]opulations served by wells whose water is blended with that from other drinking water sources are to be apportioned based on the well's relative contribution to the total blended system." 55 Fed.Reg. 51,532, 51,-572 (1990) (promulgating new HRS); *see* 40 C.F.R. pt. 300 app. A § 3.3 (1991) (new Targets section). In *Linemaster Switch,* where a listed site might have benefited from the new HRS, we acknowledged that the site would not need to be rescored. *See* 938 F.2d at 1307. But we also emphasized that the "EPA has broad discretion in determining what remedial actions are warranted." *Id.* Specifically, "[r]eleases may be deleted from or recategorized on the NPL where no further response is appropriate." 40 C.F.R. § 300.425(e) (1991). We urge the EPA to move forward, quickly, to a remedial investigation to determine whether B & B poses any measurable or meaningful health risk; if not, the Agency should act with dispatch to delist the B & B site.[6]

### III. CONCLUSION

The petition for review is denied. We uphold the EPA's decision to place the B & B facility on the National Priorities List.

---

5. It also appears that the wellfield water passes through a treatment plant before reaching the public. Neither party mentions this fact.

6. Furthermore, if the EPA finds that sites with no measurable or meaningful health risk continue to receive high HRS scores under the new model, it would seem prudent for the EPA to consider exempting such sites from the NPL.