86 F.3d 1214
 42 ERC 1865, 318 U.S.App.D.C. 220,
110 Ed. Law Rep. 543,
26 Envtl. L. Rep. 21,430
 BOARD OF REGENTS OF the UNIVERSITY OF WASHINGTON, et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner,
Administrator, Environmental Protection Agency,
Respondents.
The Balance Council, Intervenor.
 Nos. 95-1324, 95-1352 and 95-1376.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 1, 1996.
Decided June 25, 1996.
 
 On Petitions for Review of an Order of the Environmental Protection Agency.
 William R. Truitt, Baltimore, MD, argued the cause, for petitioners. With him on the briefs, were Gina M. Zawitoski, Baltimore, MD, William R. Weissman, Washington, DC, and Thornton Wilson, Seattle, WA.
 Michael J. Zevenbergen, Trial Attorney, United States Department of Justice, argued the cause for respondents. With him on the brief were Karen H. Schodowski, Trial Attorney, United States Department of Justice, Lois J. Schiffer, Assistant Attorney General, and Alan H. Carpien, Counsel, Environmental Protection Agency.
 Michael W. Steinberg and Hunter L. Prillaman, were on the brief, Washington, DC, for intervenor.
 Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Tulalip Landfill is located on Puget Sound in the State of Washington. It was operated from 1964 to 1979, when it was closed under a Clean Water Act consent decree that required construction of an impermeable "berm," a barrier around the landfill, to prevent leakage. Leakage occurred despite the berm, and in 1988 the Environmental Protection Agency ("EPA") inspected the site and sampled what it said was leachate leaking out of the berm, as well as pond water on top of the landfill. Significant concentrations of hazardous substances were found in both sets of samples. The EPA, acting under authority granted by the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA"), responded by adding Tulalip to the National Priorities List ("NPL"), a list of contaminated sites for which the EPA has found the "urgency" of remedial action to be greatest. 42 U.S.C. § 9605(a)(8)(A) & (B); National Priorities List for Uncontrolled Hazardous Waste Sites, 60 Fed.Reg. 20,330 (1995) ("Listing Decision").
 
 
 2
 The EPA bases its listing decisions for the NPL on the Hazard Ranking System ("HRS"), which assigns a numeric value to each site under a complex, multi-factor formula. Listing Decision, 60 Fed.Reg. at 20,330. The cut-off value for listing is 28.5. In its final ruling the EPA assigned a score of 50 to Tulalip, but in this court it focuses on only the "environmental threat" factors for the "surface water pathway," which under its calculations were alone enough to yield a score of 30. Petitioners, who are potentially responsible for clean-up costs at the site, challenge the listing of Tulalip on a variety of grounds. Most of their claims go to the application of undisputed legal rules to the site and are therefore reviewable under the "arbitrary and capricious" standard of 5 U.S.C. § 706(2)(A). See Kent County v. EPA, 963 F.2d 391, 393 (1992). We conclude that the listing is not arbitrary, capricious, or otherwise not in accordance with law.
 
 
 3
 * * *
 
 
 4
 The Balance Council, an organization representing "labor and business" interests in the State of Washington and an intervenor here, urges us to use this case as a vehicle for announcing a departure from what it views as an overly deferential standard of review for NPL listing decisions. Intervenor notes that listing a site virtually assures costly clean-up of the site, and that this probability in turn has significant immediate consequences for both surrounding property values and the liability of "potentially responsible parties" such as petitioners. Thus, intervenor says, listing decisions are serious matters deserving of more than a "watered-down" version of the arbitrary and capricious standard.
 
 
 5
 Intervenor's mistake lies in its belief that our application of the arbitrary and capricious standard to listing decisions is watered down. To support that belief, it points to language in Eagle-Picher Indus., Inc. v. EPA, 759 F.2d 922 (D.C.Cir.1985), where we accepted the EPA's claim that "the NPL is simply a rough list of priorities, assembled quickly and inexpensively to comply with Congress' mandate for the agency to take action straightaway. Utilizing the NPL, EPA will thereafter perform in-depth examinations of each site on the list to determine whether remedial action is necessary." Id. at 932. But the EPA's claim there was not made in support of a relaxed standard of review; rather it was offered in response to an argument that NPL listing required a showing of "imminent and substantial danger." Id. As we have explicitly recognized, a decision to list a site may have severe consequences for affected parties. "[T]he agency must remain aware that placement on the NPL has serious consequences for a site's owner. While we do not require the EPA's decisions to be perfect, or even the best, we do require that they not be arbitrary or capricious." Kent County, 963 F.2d at 394. See also Tex Tin Corp. v. EPA, 992 F.2d 353 (D.C.Cir.1993) (ordering that a listing be deleted from the NPL on the ground that EPA had failed to support its action adequately); National Gypsum Co. v. EPA, 968 F.2d 40 (D.C.Cir.1992) (vacating a listing); Anne Arundel County v. EPA, 963 F.2d 412 (D.C.Cir.1992) (same). Thus, Eagle-Picher did not suggest that our reviews of listing decisions should be of the rubber-stamp variety, and they have not been.
 
 
 6
 Source of Hazardous Substances Found in the Tulalip Samples.
 
 
 7
 Petitioners' most substantial challenge to the listing decision is their claim that the EPA wrongly attributed to the landfill the hazardous substances found in the samples taken from the berm area. They argue that the EPA, in using "unfiltered" samples--ones containing naturally occurring metals from the surrounding soil--created an unacceptable risk of wrongly attributing to the landfill hazardous metals that are in fact unrelated. Petitioners emphasize that the use of unfiltered samples was the basis for this court's actions in Kent County and Anne Arundel County, vacating the listing decisions at issue.
 
 
 8
 The EPA explained in the course of the listing decision that the appropriateness of filtering depended on whether the sample is a ground water sample, as was the case in Kent County and Anne Arundel County, or, as here, a sample of surface liquid, such as leachate.
 
 
 9
 Ground water sampling techniques (such as well drilling) are invasive, and may taint the samples with soil particles that contain naturally occurring metals not caused by the release being evaluated. Using unfiltered samples might result in an overestimation of contamination caused by the release. ...
 
 
 10
 These problems do not apply to surface water and leachate sampling, because the sampling medium is immediately available and visible to the sampler. Surface water sampling methods do not require well drilling, disturbance of sediments, or other "invasive" sample collection techniques (typically associated with ground water sampling) that can lead to sample contamination.... This means that the samples are likely to be representative of conditions in the surface water body being sampled.
 
 
 11
 Support Document for the Revised National Priorities List Final Rule--April 1995 ("Support Document"), at 2.3-123. The cost of relying on unfiltered samples is the risk of overestimating contaminants. Id. at 2.3-122. But filtering, although it does not remove dissolved metals, which are generally the more toxic, does remove certain "suspended or colloidal solids," risking an underestimate of the site's dangers. Id. at 2.3-124. So there is a risk of error either way. With the surface water samples involved here, the concern about overestimation of contaminants from the use of unfiltered samples is reduced, thus improving the case for non-filtration, as well as providing one (but not the only) distinction from the Kent County and Anne Arundel County cases. Petitioners do not impugn the reasoning behind the EPA's selection among the concededly imperfect alternatives. Accordingly, and particularly as the decision is a technical one within the EPA's expertise, we naturally defer to the decision. See Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) ("a reviewing court must generally be at its most deferential" when examining a "scientific determination" within the agency's "area of special expertise").
 
 
 12
 The distinction between surface and ground water coincides with another distinction between this case and our decisions in Kent County and Anne Arundel County. In those cases the EPA had adopted guidelines for the region stating that because of the different risks of filtered and unfiltered samples it was best to use both when conducting ground water tests. Kent County, 963 F.2d at 397; Anne Arundel County, 963 F.2d at 416. At the specific sites the agency had used unfiltered samples only, contradicting the regional policy, and it was this inconsistency that led us to find that the EPA had acted in an arbitrary and capricious fashion. Here, in contrast, the standard operating procedures for Region 10, where Tulalip is located, promulgated in September of 1988, a few months after the Tulalip samples were collected, provided that "sample filtration is NOT recommended" for inorganic surface or drinking water samples. Memorandum from John Osborn to Jeffrey Villnov (Sept. 2, 1988), at 1-2.
 
 
 13
 Petitioners seek to supplement the record on review with documents indicating that the EPA has used filtered samples at other sites within Region 10. We assume without deciding that a petitioner may use documents from other proceedings to show such discrepancies without having made them part of the record in the proceeding under review (and thus without having confronted the agency with evidence of its alleged vacillation). The EPA distinguishes the context of the allegedly discrepant instances, saying that it used filtered samples in the context not of listing decisions, but of later procedures, such as "remedial investigation and feasibility studies," designed to determine the appropriate scope of remedial action at an already listed site. As we have seen, the EPA views the issue of filtering as involving a tradeoff between risks of wrongly attributing contaminants to a site and of failing to detect all the contaminants for which a site is responsible. Support Document at 2.3-122. It is not on its face unreasonable for the EPA to strike the balance by erring on the side of over-inclusion at the listing stage and on the side of under-inclusion at the remedial phase, where it explicitly orders the incurring of remediation costs and where any under-inclusiveness of the measure of hazardous substances may well be balanced by "conservative" estimates of the risk of environmental harm from those substances.[1]
 
 
 14
 Besides attacking the EPA's use of unfiltered samples, petitioners say that its attribution of the hazardous substances detected in the samples to the landfill failed to recognize that the area from which the samples were taken is routinely inundated by tidal water. The tidal flow, they argue, may have deposited contaminants from other sources at the landfill site and thus made it impossible to isolate any liquid at the site as "leachate." While recognizing a degree of uncertainty in its findings, the EPA regarded the argument as inadequate to impair its conclusion that the sampled material was in fact leachate--i.e., material that had come from the landfill rather than some other source. It explained that normal procedures require samples to be taken immediately adjacent to the landfill; that no departure from these procedures had been recorded; that the fieldworkers rejected some samples, indicating at least a measure of judgment; and that it would accept "the fieldworkers' judgments on the flows being seeps in the absence of definitive evidence to the contrary." Id. at 2.3-104 to 2.3-105.
 
 
 15
 The EPA also pointed to other test results that tended to confirm its position. It noted that metals detected in the samples from the berm area were also detected in the ponded water samples taken from the top of the landfill, suggesting the landfill as the common source. Id. at 2.3-107 to 2.3-113. Petitioners now attack the agency's reasoning on the ground that the ponded water samples did not contain PCBs, which were found in the samples taken near the berm. Site Inspection Report--Tulalip Landfill (July 1988), at 25, 38. But four of the eight samples from around the berm also did not contain PCBs in detectable quantities, id. at 38, 42, suggesting that there may be some unevenness in the landfill. The EPA also noted, in support of its claim that the observed contaminants came from the landfill, that samples taken from areas through which tidal water would be likely to flow did not show the heightened levels of contaminants detected in the samples from the berm area. As the EPA explained, "[I]f hazardous substances were ... introduced to the site via tidal influence, they would also likely be found in samples from locations in the nearby sloughs." Support Document at 2.3-136. But neither mercury nor PCBs--two of the substances contained in the berm samples--were found in the slough samples. Id. Petitioners claim that the EPA is comparing "apples [and] oranges ... (i.e., deep, fast-moving surface water vs. shallow tidal pools)," Petitioners' Joint Reply Brief at 11, but in fact the EPA refers to both water and sediment samples from the slough areas, Support Document at 2.3-136. The EPA has thus "examined [the] relevant data and ... articulated a rational explanation for its action." Eagle-Picher Indus., Inc. v. EPA, 759 F.2d 905, 921 (D.C.Cir.1985). Its bases for attributing contaminants to the landfill are adequate.
 
 
 16
 Deficiencies in Laboratories Handling the Tulalip Samples.
 
 
 17
 Petitioners raise a variety of claims about the quality of the work in the laboratories used by the EPA for analyzing the Tulalip samples. First, they claim that general performance problems at the labs around the time the samples were processed preclude the EPA from relying on their analyses. The record reveals a January 1988 letter to the EPA from Enseco, evidently the owner of one of the labs involved here, the Rocky Mountain Analytical Laboratory, seeking to explain "serious technical deficiencies" perceived by the EPA in the lab's performance and apparently accounting for the EPA's withholding of payment. And the parties agree (though neither points to record support) that the other lab involved, Compuchem, failed two quarterly performance evaluations around the time the Tulalip samples were processed.
 
 
 18
 Petitioners raise important concerns about the quality of the data being fed into the complex HRS model. The EPA in fact took petitioners' claims seriously, reexamining the labs' results and performing multiple validation studies. While this could not rule out every conceivable mishap with the data, the EPA does not face a standard of absolute perfection. Kent County, 963 F.2d at 394. Rather, it is statutorily required to "assure, to the maximum extent feasible," that it "accurately assesses the relative degree of risk" posed by sites. CERCLA § 105(c)(1), 42 U.S.C. § 9605(c)(1) (emphasis added). The more demanding the requirements that the EPA imposes on its contractor labs, and the more rigorous its checking of performance, the greater the likelihood (other things being equal) that it will turn up evidence that labs have fallen short. It would hardly make sense for the courts to respond to the resulting evidence by treating a lab's findings as fatally defective whenever it comes up short in any way, especially on projects other than the one under review. Thus, the EPA did not act arbitrarily or capriciously in concluding that the general performance problems alluded to by petitioners were not, without more, a basis for starting from scratch on every sample analyzed by those labs. Support Document at 2.3-87 to 2.3-91.
 
 
 19
 We note that in the agency proceeding the EPA was under the mistaken impression that Compuchem had not in fact failed a performance evaluation during the period in which the Tulalip samples were tested. Id. at 2.3-86 to 2.3-87. But it is clear from the EPA's general reasoning about the ramifications of lab performance problems that the additional fact about Compuchem would not have altered its conclusion. Thus, we may sustain its decision despite the oversight.
 
 
 20
 Apart from general performance problems at the labs, petitioners claim that the absence of required documentation tracking the Tulalip samples through the labs violated the 1987 "Statement of Work for Organic Analysis" promulgated by the EPA's Contract Laboratory Program. The Statement requires labs to have in place written procedures for "tracking the work performed on any particular sample," including "[a] description of the documentation used to record sample receipt, sample storage, sample transfers, sample preparations, and sample analyses." The EPA replied to petitioners' argument by stating that "secure" labs, such as the two involved here, are not required to maintain internal tracking documents for samples. Support Document at 2.3-70 to 2.3-71. The tracking procedure requirements thus mean only that labs (at least secure ones) are to describe any documentation they may decide to use. This reading seems highly questionable. Particularly as the requirements refer to "the" documentation used, rather than to "any" documentation, an implied insistence on documentation seems far more plausible.
 
 
 21
 In any event, we think petitioners err in assuming--as they did for the general lab deficiencies discussed above--that the EPA's only lawful response was to scrap the results and start anew. As noted above, the EPA took the position that petitioners must pinpoint "specific problems" with the data used, id. at 2.3-88, and cannot rely on "vague allegations against the validity or usability" of the results, id. at 2.3-89. If there are "minor contractual deficiencies," the appropriate response is to review the deficiencies on a "case-by-case basis" to determine their impact on "the usability of the data." Id. at 2.3-90. Again, any other approach would deter the agency from adopting rigorous standards for labs in the first place. The EPA's reasoning makes clear that, even apart from its reading of the 1987 Statement of Work not to require tracking documentation at all, it would not have found the bare absence of such documentation--without any reason to think it had any effect on the Tulalip results--fatal to reliance on them. We therefore sustain the EPA's conclusion on this ground.[2]
 
 
 22
 Location of Tulalip in an Environmentally Sensitive Area.
 
 
 23
 Tulalip's HRS score was increased substantially by the EPA's conclusion that the landfill was located adjacent to a National Estuary Program ("NEP") study area and in the midst of wetlands. Petitioners attack both of these findings. Because the proximity to wetlands alone brings Tulalip's HRS score to 30 (assuming the failure of their attacks on all other aspects of the decision except the increase for proximity to the NEP study area), we focus on the wetlands determination.
 
 
 24
 Petitioners were obscure on this issue in their opening brief, merely stating, in conclusory fashion and without visible support, that "EPA has not 'made an independent identification and delineation of on-site wetlands.' " Petitioners' Joint Opening Brief at 35 n. 147 (quoting from comments submitted by petitioners to EPA). In their reply brief, petitioners warmed to the wetlands issue, offering the new argument that the EPA incorrectly relied on an outdated Army Corps of Engineers determination of surrounding wetlands. By failing to make any specific objection until their reply brief, petitioners deprived the EPA of the opportunity to respond. To prevent this sort of sandbagging of appellees and respondents, we have generally held that issues not raised until the reply brief are waived, Charter Oil Co. v. American Employers' Ins. Co., 69 F.3d 1160, 1171 (D.C.Cir.1995); Corson & Gruman Co. v. NLRB, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990), and we do so here. The wetlands determination therefore survives intact.
 
 
 25
 Other Arguments.
 
 
 26
 Petitioners mount several other challenges to the decision to list Tulalip, none of which requires extended discussion. They first claim that the decision was arbitrary and capricious because any contamination of the site may have resulted from another party's violation of a Clean Water Act permit. The EPA replied that listings do not turn on an assignment of responsibility for the contamination, just on the fact of its occurrence, so that this concern was not relevant. Support Document at 2.3-47. Petitioners cite nothing to the contrary.
 
 
 27
 Petitioners next argue that the EPA violated the notice-and-comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, by failing to provide them with an opportunity to comment on certain of the documents supporting the Tulalip listing. Petitioners complain that these documents--which reflect the EPA's efforts to respond to comments raised by petitioners--were released only upon promulgation of the final rule listing the site. But the EPA was under no obligation to consider petitioners' comments in the first place, as they were submitted well after the close of the comment period. See National Priorities List for Uncontrolled Hazardous Waste Sites, 56 Fed.Reg. 35840, at 35842/3 (1991).
 
 
 28
 Petitioners make two arguments arising out of ex parte communications between representatives of the Tulalip Tribe, which appears to control the land in question, and the EPA, in one of which the Tribe representative wrote, "We need your help! The Tulalip landfill still has not been listed on the NPL. ... We need this site to be listed immediately!!!!!!!" (It appears that the tribe is entitled to recover clean-up costs from responsible parties. See 42 U.S.C. § 9607(a)(4)(A).) The first argument was that these communications tainted the process, but petitioners appear to have dropped this argument after the EPA responded with strong reason to believe the contrary--namely, that the individual who received the cry for help was not involved in the listing decision. Petitioners also make a more purely procedural argument, relying on Sierra Club v. Costle, 657 F.2d 298, 400-04 (D.C.Cir.1981), that the EPA's failure to include a summary of the ex parte communications in the Tulalip docket violated the APA. But Sierra Club involved statutory language (§ 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d)) providing that all documents "of central relevance to the rulemaking" were to be placed in the docket as soon as possible after they became available, see 657 F.2d at 402--language that has no counterpart in the notice-and-comment provisions of 5 U.S.C. § 553.
 
 
 29
 Finally, petitioners claim that the Tulalip listing is invalid because the EPA failed to transmit a copy of the final listing rule to Congress simultaneously with its promulgation, thereby depriving Congress of the opportunity, provided by § 305(a) of CERCLA, 42 U.S.C. § 9655(a), to veto the rule by resolution of both houses of Congress (or even by one house with the acquiescence of the other under some circumstances). The EPA responded by saying that it had satisfied the requirement in substance by promptly informing members of Congress from the site's area, and by sending official notice nine months after the listing decision. We question whether such belated notice could have satisfied § 305, which allowed the congressional veto only within 90 calendar days of continuous session after the date of promulgation. We think it clear, however, that § 305's legislative veto violates the Constitution as interpreted in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), as it makes no provision for presentment of the vetoing resolution to the President. Accordingly, assuming the notice requirement is severable, invalidation of the listing decision is plainly an inapt response to the delay in the EPA's compliance.
 
 
 30
 * * *
 
 
 31
 The parties have made some procedural motions--the EPA a Motion to Disregard Extra-Record Material and New Arguments in Petitioners' Reply Brief, and petitioners a Motion to Enlarge the Administrative Record on Review--the disposition of which, in light of our analysis, could have no effect on the outcome. They are accordingly dismissed as moot. Because the EPA has not behaved in an arbitrary or capricious manner and has not otherwise violated the APA or any valid procedural requirement of CERCLA, the petitions for review are
 
 
 32
 Denied.
 
 
 
 [1]
 For similar reasons, EPA policies that express a preference for the use of filtered samples for certain "aquatic life mineral criteria," see Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants; States' Compliance--Revision of Metals Criteria, 60 Fed.Reg. 22229, at 22230/1 (1995); Memorandum from Martha G. Prothro to Water Management Division Directors (Oct. 1, 1993), at 2, do not establish any self-contradiction by the EPA. Apart from not on their face applying to NPL listing decisions at all, they postdate the Tulalip sampling by five years or more and permit states to use unfiltered samples if they so choose
 
 
 [2]
 Petitioners also argue that the labs involved in processing the Tulalip samples lacked general written procedures for tracking, in violation of the 1987 Statement of Work. But the audit reports on which they rely for support--even assuming these may be added to the administrative record at this juncture--make clear that the labs did have such procedures, though the auditors felt that the procedures could be improved in some respects. See Laboratory Evidence Audit Report, Rocky Mountain Analytical Laboratory (Sept. 7, 1988), at 2, 4-6; Laboratory Evidence Audit Report, Compuchem Laboratories, Inc. (Nov. 15, 1988), at 2, 4-6