NATURAL RESOURCES DEFENSE COUNCIL; Southeast Alaska Conservation Council; Sierra Club; Organized Village of Kake; Hoonah Indian Association; Alaska Wilderness Recreation and Tourism Association; Tongass Conservation Society; Sitka Conservation Society; Alaska Center for the Environment; Alaska Wilderness League, Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Christine Todd Whitman,* Administrator, U.S. Environmental Protection Agency; and L. John Iani,** Regional Administrator, Region 10 U.S. Environmental Protection Agency, Respondents,

Alaska Forest Association, Inc.; Sealaska Corporation; Sealaska Timber Corporation, Intervenors.

No. 00–70890.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 2002

Filed Feb. 13, 2002.

* Christine Todd Whitman is substituted for her predecessor, Carol M. Browner, as Administrator, U.S. Environmental Protection Agency. *See* Fed. R.App. P. 43(c)(2).

** L. John Iani is substituted for his predecessor, Charles C. Clarke, as Regional Administrator, Region 10, U.S. Environmental Protection Agency. *See* Fed. R.App. P. 43(c)(2).

Sharon Buccino, Natural Resources Defense Council, Washington, D.C.; Robert E. Lindekugel, Southeast Alaska Conservation Council, Juneau, AK, for the petitioners.

Alan D. Greenberg, United States Department of Justice, Environment & Natural Resources Division, Denver, CO, for the respondents.

Jonathan K. Tillinghast, Simpson, Tillinghast, Sorensen, Lorensen & Longenbaugh, Juneau, Alaska; J.W. Peterson, Ziegler Law Firm, Ketchikan, AK, for the intervenors.

Before: THOMAS, GRABER, and GOULD, Circuit Judges.

THOMAS, Circuit Judge.

Petitioners seek review of permits issued by the United States Environmental Protection Agency ("EPA") authorizing the operators of log transfer facilities in Alaska to release bark and woody debris into marine waters. We conclude that the EPA failed to provide adequate notice and opportunity for comment prior to issuing the final general permits, and we grant the petition for review in part.

## I

To achieve the goal of reducing and eventually eliminating pollution, Congress prohibited the "discharge of any pollutant" from a "point source" into the waters of the United States, unless that discharge complies with the Clean Water Act ("CWA") of 1971, 33 U.S.C. §§ 1251–1387. 33 U.S.C. §§ 1311(a), 1342. The National Pollutant Discharge Elimination System ("NPDES") is one of the primary means of

controlling water pollution under the CWA. *See* CWA § 402, 33 U.S.C. § 1342. Under the NPDES, a pollutant cannot be discharged from a point source unless the discharge is authorized by an NPDES permit. *See id.; see also* CWA § 301, 33 U.S.C. § 1311. A state may create its own program for issuing NPDES permits. *See* CWA § 402(a)-(c), 33 U.S.C. § 1342(a)-(c). Alaska has not chosen to do so, and thus the EPA issues NPDES permits for discharges of pollutants within Alaska.

NPDES permits come in two varieties: individual and general. An individual permit authorizes a specific entity to discharge a pollutant in a specific place and is issued after an informal agency adjudication process. *See* 40 C.F.R. §§ 122.21, 124.1–124.21, 124.51–124.66. General permits, on the other hand, are issued for an entire class of hypothetical dischargers in a given geographical region and are issued pursuant to administrative rulemaking procedures. *See id.* §§ 122.28, 124.19(a). General permits may appropriately be issued when the dischargers in the geographical area to be covered by the permit are relatively homogenous. *See id.* § 122.28(a)(2). After a general permit has been issued, an entity that believes it is covered by the general permit submits a "notice of intent" to discharge pursuant to the general permit. *Id.* § 122.28(b)(2). A general permit can allow discharging to commence upon receipt of the notice of intent, after a waiting period, or after the permit issuer sends out a response agreeing that the discharger is covered by the general permit. *Id.* § 122.28(b)(2)(iv). Whichever of these three authorization methods is used in the general permit, the permit issuer can require a particular discharger to undergo the individual permit application process. *Id.* § 122.28(b)(3).

Under the CWA, each state sets its own water quality standards, subject to review and approval by the EPA. *See* CWA § 303, 33 U.S.C. § 1313; 40 C.F.R. §§ 131.4, 131.10–131.12. Before approving a state's proposed standards, the EPA must be satisfied that the standards comply with the requirements of the CWA. CWA § 303(a), 33 U.S.C. § 1313(a). Alaska has enacted water quality standards that have been approved by the EPA. *See* Alaska Admin. Code tit. 18, ch. 70.

Before the EPA can issue either an individual or a general NPDES permit, the state in which the discharge will occur must certify, or waive its right to certify, that the discharge authorized by the permit will comply with the state's water quality standards. CWA § 401(a), 33 U.S.C. § 1341(a); 40 C.F.R. §§ 122.4(b), 124.53.

II

Because of Alaska's unique and rugged terrain, most logs cut in Alaska are transported to market through marine waters. For transport, the logs are tied together into bundles that form log rafts. The bundles are placed into the water at log transfer facilities ("LTFs"). *See* 33 U.S.C. § 1342 note. From these points, the bundles are towed to destinations such as sawmills and shipping ports.

During this process, particularly at the point where the logs are placed into the water, the logs rub against each other and sometimes against the bottom of the body of water. This friction, as well as the contact of the logs with the water itself, causes bark and woody debris to be rubbed or broken off and released into the water. Different methods of placing the logs into the water result in different amounts of bark and woody debris being released. Bark and woody debris remain in the water and do not decay for many years. In areas where the water lacks strong currents or where high amounts of bark and woody debris enter the water, the bark and woody debris can accumulate

into significant concentrations. These accumulations of bark and woody debris create problems for marine life and worsen the quality of the water.

The EPA identified bark and woody debris as a pollutant in the early 1980s. Consequently, the EPA required new LTFs to obtain individual permits before discharging bark and woody debris. *See* Water Quality Act of 1987, Pub.L. No. 100–4, § 407(a), 101 Stat. 7, 74 (1987); *see also* CWA § 402, 33 U.S.C. § 1342 & note.

Most LTFs in existence before October 22, 1985, however, have not been required to obtain new permits. Congress enacted a special statutory provision allowing them to continue discharging under the authority of permits issued pursuant to prior statutory authority. *See* Water Quality Act § 407(b); *see also* 33 U.S.C. § 1342 note. However, if the EPA determines, after the opportunity for a hearing, that an LTF's existing pre–1985 permit does not comply with current substantive standards, the EPA can modify the permit to incorporate additional requirements in order to ensure compliance with current substantive standards. *See id.*

In the mid–1990s, the EPA came to the conclusion that the pre 1985 permits did not comply with the CWA. According to the EPA, the pre 1985 permits did not: (1) "include a zone of deposit for underwater accumulations of bark and woody debris at the LTF"; (2) "include uniform monitoring and reporting requirements"; or (3) "provide uniform application of best management practices and specific effluent limitations."

Accordingly, the EPA proposed to modify all pre–1985 permits for LTFs in Alaska. The EPA issued for comment a draft general permit that would apply to nearly all LTFs in Alaska, including new LTFs and existing LTFs functioning under individual, post 1985 NPDES permits as well as LTFs functioning under pre–1985 permits. The proposed permit included changes in monitoring and reporting requirements, management practices, and effluent limitations. It also noted that Alaska proposed to allow a one-acre zone of deposit for bark and woody debris, defined by accumulations of 100 percent cover that exceed four inches' depth at any point, and to allow patchy distribution of bark beyond the one-acre zone of deposit.

A "zone of deposit," a creature of Alaska state law, is an area in which Alaska's water quality standards can be violated. *See* Alaska Admin. Code tit. 18, § 70.210(a). Alaska's water quality standards consist of maximum levels for the amount of pollutants that can be in waters of different classifications. *See id.* § 70.020(b). Bark and woody debris fall into the category "residues." The maximum amount of residue that can be in the highest class of water is defined as the amount that does not "make the water unfit or unsafe for use, ... or cause a sludge, solid, or emulsion to be deposited beneath or upon the surface of the water, within the water column, on the bottom, or upon adjoining shorelines." *Id.* § 70.020(b) at 634, 641. The parties interpret this provision as meaning that, in general, any bark or woody debris released into the water would violate this standard. Because a zone of deposit is an area in which the standards can be violated, however, bark or woody debris can be released into an approved zone of deposit without violating Alaska's water quality standards.

The one-acre size for the zones had been prior practice for at least some pre–1985 permits and some post–1985 individual NPDES permits. As noted by the EPA in the draft general permit, the one-acre size for the zones stemmed from interim guidelines promulgated by the Alaska Timber Task Force ("ATTF") in 1985.

As it was required to do, the EPA sought certification from Alaska before it finalized the proposed general permit for LTFs in Alaska. The Alaska Department of Environmental Conservation ("ADEC") is the Alaska agency that provides such certification, and it follows its own public comment and review procedures before providing certification. The EPA noted this fact in the draft general permit, stating that "[p]ersons wishing to comment on State Certification of the proposed general NPDES permit should submit written comments within this public notice period to [ADEC]."

In its first and second draft certifications, ADEC proposed that the zones of deposit be one acre of continuous bark coverage at least ten centimeters deep at any point. It also indicated that a zone of deposit could include patchy or discontinuous coverage outside the one acre of continuous coverage. It proposed that LTFs be required to submit remediation plans detailing "feasible" means of reducing bark and woody debris when an accumulation exceeded 1.5 acres of continuous coverage.

In its final draft certification, which apparently was not circulated to the public for comment, ADEC placed no specific size limit on zones of deposit. Instead, it authorized each LTF's zone to be its "project area," or the entire area of water covered by its operations. ADEC maintained the requirement that LTFs propose feasible remediation measures, but the requirement would be triggered by an accumulation of one acre of continuous coverage at least ten centimeters deep at any point, rather than 1.5 acres.

The EPA responded to this proposal with a letter expressing concern that this change made the requirements less stringent than they previously had been and thus did not comply with applicable antidegradation laws, which prohibit changes that degrade, rather than improve, water quality. See Alaska Admin. Code tit. 18, § 70.015; see also 40 C.F.R. § 131.12 (requiring states to develop and adopt antidegradation policies). ADEC replied that it proposed project-area zones because it believed that the one-acre limit did not accurately reflect what had in fact occurred in the past; that the one-acre limit was impracticable in a general permit as compared to individual permits; and that other changes in the definition of zones of deposit—such as including thinner accumulations and spotty, non-continuous accumulations—and remediation requirements made the proposal as effective, if not more effective, in maintaining water quality.

The project-area definition for zones of deposit was incorporated into ADEC's final certification for the EPA's general LTF permit. The EPA accepted ADEC's certification.

The EPA then issued final general permits. Instead of the one general permit originally proposed, the EPA issued two general permits: one for pre–1985 LTFs, AK–G70–0000, and one for post–1985 LTFs, AK–G70–1000. Both permits incorporated ADEC's project-area zone of deposit definition.

Under the final permits, pre–1985 LTFs must submit notification to the EPA and to ADEC before engaging in activities that will release bark and woody debris. However, the notification is informational only and the LTFs may engage in the activities without any further action from the EPA. Post–1985 LTFs must submit a notice of intent and then receive approval from the EPA before engaging in any activities that will release bark and woody debris. The public will not have the opportunity to comment before the EPA decides whether to give its approval. For either type of LTF, ADEC can determine that a project-area zone of deposit is not appropriate. For post–1985 LTFs, ADEC can inform

the EPA that the LTF should go through an individual permit process, rather than being covered by the general permit.

## III

### A

■ Under the Administrative Procedures Act, the EPA must provide the public with notice and an opportunity to comment before it issues NPDES permits. 5 U.S.C. § 553(b)-(c); 40 C.F.R. §§ 124.6(d), 124.10(a)(1)(ii), (b); *see also NRDC v. EPA*, 863 F.2d 1420, 1428–29 (9th Cir. 1988) (applying notice and comment requirement to general NPDES permit). Like other agencies, the EPA "must provide notice sufficient to fairly apprise interested persons of the subjects and issues before the Agency." *Id.* at 1429 (internal quotation marks and citations omitted).

■ Of course, the final permit issued by the agency need not be identical to the draft permit. That would be antithetical to the whole concept of notice and comment. Indeed, it is "the expectation that the final rules will be somewhat different and improved from the rules originally proposed by the agency." *Trans–Pac. Freight Conference v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1249 (D.C.Cir.1980). Thus, "[t]he law does not require that every alteration in a proposed rule be reissued for notice and comment." *First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C.Cir. 2000).

■ However, "a final rule which departs from a proposed rule must be a logical outgrowth of the proposed rule.... The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft permit." *NRDC v. EPA*, 863 F.2d at 1429 (internal quotation marks and citations omitted); *see also* 40 C.F.R. § 124.10 (setting forth specific public notice and

comment requirements for the EPA). In determining this, one of the salient questions is "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C.Cir. 1994); *see also Anne Arundel County v. EPA*, 963 F.2d 412, 418 (D.C.Cir.1992); *Am. Med. Ass'n v. United States*, 887 F.2d 760, 768 (7th Cir.1989) (stating that "the relevant inquiry is whether or not potential commentators would have known that an issue in which they were interested was 'on the table' ").

■ On a petition for review from an agency decision, we determine in the first instance the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the adequacy of the notice and comment opportunities it provided. *NRDC v. EPA*, 863 F.2d at 1428–29. A decision made without adequate notice and comment is arbitrary or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A).

### B

■ In this instance, we conclude that the EPA's notice and comment procedure was inadequate because it did not afford interested parties the opportunity to comment on whether Alaska's proposed change in the zone of deposit definition conformed to the substantive requirements of Alaska law and, if not, whether the change required the issuance of a conditional permit or the denial of the permit altogether.

Under the CWA, the EPA has its own independent obligation to determine whether a permit will comply with the state's water quality standards. *See* 33 U.S.C. §§ 1311(b)(1)(C), 1342(a)(1); 40 C.F.R. § 122.4(d); *Dubois v. United States*

*Dep't of Agric.*, 102 F.3d 1273, 1300–01 & n. 33 (1st Cir.1996); *In re Ina Rd. Water Pollution Control Facility*, NPDES Appeal No. 84–12, 1985 WL 287130 (EPA Nov. 6, 1985).

In its draft permit, upon which public comment was solicited, the EPA noted:

If issued, this general NPDES permit would authorize qualifying LTFs to discharge bark and woody debris into both near-shore and offshore marine waters in Alaska, except in areas excluded from coverage. The proposed general permit would not authorize new discharges into waters identified as critical or protected resources, waters which do not meet the ATTF siting guidelines, and waters already exceeding State Water Quality Standards for parameters relating to bark and woody debris. ADEC proposes to grant a one-acre zone of deposit for those LTFs authorized under this general permit.

As noted earlier, the referenced one-acre zone of deposit area was consistent with then-existing Alaska regulatory practice. When it became apparent that Alaska's draft certification proposed a different practice, EPA's NPDES Unit Manager wrote the State to inquire, noting:

The Department has changed its approach to the authorized Zone of Deposit for bark and wood debris from the approach contained in the ATTF Guidelines, which has been used for authorizing ZODs since the guidelines were developed. We understand that the Department intends to authorize a ZOD equal to the size of each LTF's project area and that the Department does not intend to limit the project area to a specified, maximum size nor impose limiting criteria that would serve to maintain or contain the size of the project area throughout the term of the permit. In the draft final certification, the Department indicates that it will require Remediation Plans from permittees if the continuous coverage of bark and wood debris exceeds one acre and 10 centimeters at any point. However, the one acre/10 centimeter trigger is not a violation of the ZOD nor the State's water quality standard for residue, thus, it is not a limit on the ZOD.

Because the proposed "project area ZOD" is less stringent than previous ZODs for LTFs, in accordance with 40 C.F.R. § 124.53(e)(3), EPA requests a statement from the Department explaining how the proposed ZOD complies with state law. The Department should include in the statement how the ZOD meets its antidegradation policy at 18 AAC 70.015, and explain how the ZOD will protect beneficial uses found at 18 AAC 70.020(b)(2). The Department also needs to address how it is meeting the requirement in 18 AAC 70.210(a) that the *"limit"* of the ZOD be set by the Department.

Upon reviewing Alaska's response, the EPA issued a final permit approving Alaska's new zone of deposit definition. However, the public was never notified that Alaska was proposing to redefine the allowable zone of deposit, nor was the public afforded the opportunity to comment on the proposed change, either at the state or federal level.

In determining the adequacy of EPA's notice and comment procedure as to this issue, the salient question is, as we have noted, "whether interested parties reasonably could have anticipated the final rulemaking from the draft permit." *NRDC v. EPA*, 863 F.2d at 1429. Given that the draft permit specifically referenced Alaska's proposed "one-acre zone of deposit" and conformance with the ATTF guidelines, interested parties could not have reasonably anticipated that the final permit would sanction the use of project-area

zones of deposit that could exceed one acre. The fact that interested parties did not anticipate the paradigm shift from the draft to the final permit is underscored by the contents of the instant petition for review, which raises for the first time numerous issues about the proposed change in the conception of zones of deposit. These are precisely the type of comments that should have been directed in the first instance to the EPA, but which understandably were not because of the inadequate notice. Because the EPA's change of position from the draft permit was not "foreshadowed in proposals and comments advanced during the rulemaking," *S. Terminal Corp. v. EPA,* 504 F.2d 646, 658 (1st Cir.1974), the "decision clearly caught petitioners ... by surprise," *Consumer Energy Council of Am. v. FERC,* 673 F.2d 425, 446–47 n. 76 (D.C.Cir.1982).

 Further, interested parties are entitled to be fairly apprised of the subjects and issues before the agency in a permitting process. *NRDC v. EPA,* 863 F.2d at 1429. The public was not informed that EPA had raised the substantive issue about Alaska's proposed change in its definition of zones of deposit. Indeed, the proposed alteration was almost the only substantive issue left for resolution prior to issuance of the final permit. In short, the interested parties did not know that a fundamental change in the zone of deposit definition "was 'on the table.'" *Am. Med. Ass'n,* 887 F.2d at 768.

 The EPA argues that the draft permit's references to the role of state law and the state certification process and the fact that the proposed zones of deposit might allow "patchy or discontinuous" bark coverage outside the one-acre zone of continuous coverage were sufficient to put interested parties on notice. However, nuance and subtlety are not virtues in agency notice practice. If the EPA were contemplating approving entirely new constructs

for allowable zones of deposit and departing from the ATTF guidelines, it should have said so explicitly. More importantly, there is no question that the change was substantive. The EPA acknowledged as much in its letter to the State, noting that "[t]he Department has changed its approach ... from the approach contained in the ATTF Guidelines, which has been used for authorizing ZODs since the guidelines were developed." Given the draft permit's stated "heavy reliance" on the ATTF Guidelines, there is no doubt that there was a fundamental policy shift, rather than a natural drafting evolution, between the draft permit and the final permit. Given that the "final rule deviate[d] ... sharply from the proposal," *NRDC v. EPA,* 863 F.2d at 1429, the EPA erred in not affording notice and soliciting further comments.

## C

 The fact that the certification process is vested with the state agency does not alter this conclusion. To be sure, the EPA does not act as a reviewing agency for state certification, and the proper forum for review of state certification is through applicable state procedures. 40 C.F.R. § 124.55(e). However, it is not the state certification that is at issue here; rather, it is the EPA's independent statutory obligation under the CWA to ensure compliance with water quality standards, *see* 33 U.S.C. §§ 1311(b)(1)(C), 1342(a)(1), and its power to impose additional permit conditions necessary to meet that end, *Dubois,* 102 F.3d at 1300 & n. 33.

The letters sent to and from the EPA and ADEC about the new definition make this point clear. The EPA considered whether the new definition of zones of deposit would ensure compliance with Alaska's water quality standards and eventually made a final decision that it would. In making this decision, the EPA sought

and considered the opinion of ADEC, but it did not seek and consider the opinions of other interested parties or the public in general. If the EPA had reached the opposite conclusion, and had added additional requirements to the final permits, Alaskan logging interests would surely have taken the position that notice and comment had been inadequate.

Thus, the EPA erred by deciding whether the new definition of zones of deposit would reasonably ensure compliance with Alaska's water quality standards without giving notice to the public and affording it the opportunity to comment on issues relevant to that decision. Because the public could not have reasonably anticipated that the final permit would embrace an entirely different standard for zones of deposit, the public's ability to comment on whether the proposed permit complied with water quality standards was compromised.

CONCLUSION

Because the EPA did not provide notice or an opportunity to comment on whether the project-area definition for zones of deposit satisfies the requirements of Alaska law, the two new general permits must be remanded to the EPA for further proceedings. Because of this resolution of the case, we need not reach the other issues raised by the parties.

**PETITION GRANTED; REMANDED** for further proceedings consistent with this opinion.